UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
JAMES BERRY,                            :
                         Petitioner,    :
                                        :     06 Civ. 6957 (DLC)
            -v-                         :
                                        :     OPINION & ORDER
ROBERT E. ERCOLE,                       :
                         Respondent.    :
                                        :
----------------------------------------X

Appearances:

For Petitioner:
Oliver A. Smith
110 Wall St., 11th Floor
New York, NY 10005

For Respondent:
Robert M. Morgenthau
District Attorney
Allen J. Vickey
Assistant District Attorney
New York County
One Hogan Place
New York, NY 10013

DENISE COTE, District Judge:

     Pared to its essentials, the question presented through
this habeas petition is whether an attorney provides ineffective
assistance of counsel when he fails to advise his client, who is
adamant in his position that he is innocent, to plead guilty.
In this case, the answer is no.

     James Berry filed this petition for a writ of habeas corpus
in 2006, challenging his conviction on attempted murder and
other charges.  The petition was referred to the Honorable

Theodore Katz, who issued a report on December 19, 2008
("Report") recommending that the petition be granted solely with
respect to Berry's claim that his trial counsel provided
ineffective assistance in connection with Berry's decision to
reject on the eve of trial a plea offer of nine years'
imprisonment in satisfaction of all charges.  Berry proceeded to
trial, was found guilty of all charges submitted to the jury,
and was sentenced principally to thirty-five years'
imprisonment.

The Report relied significantly on the testimony given by
Berry and his trial counsel Allan Brenner ("Brenner") during a
November 2008 hearing before Magistrate Judge Katz.  After the
respondent objected to the Report's recommendation that the writ
be issued, this Court again heard testimony from Berry and
Brenner.  This Opinion presents the procedural history relevant
to this ineffective assistance of counsel claim and this Court's
findings regarding the claim.  For the reasons explained below,
the petition is denied in its entirety.

BACKGROUND

Berry was arrested on November 30, 1999, following a fifty-
block high-speed car chase down the Harlem River Drive and the
FDR Drive.  He already had a long arrest record, although he had
no felony convictions.  For two recent arrests, Berry had been
successfully represented by Scott Brettschneider

("Brettschneider") and by Brenner, an experienced criminal
defense trial lawyer who worked in an "of counsel" capacity at
Brettschneider's firm.[1]  Each attorney had defended Berry at
trial and each had won an acquittal.  As a result, Berry, who
had been remanded to Rikers Island following his November 30
arrest, and his family retained Brettschneider to defend Berry
and obtained the services of Brenner as Berry's trial counsel.

The high-speed chase on November 30 began at the scene of a
shooting.  As shown by the testimony at Berry's state court
trial in 2001, Berry had physically harassed Aileena Brown
("Brown") in a Manhattan grocery store.  She protested and when
they emerged from the store, her husband, Boris Grant ("Grant"),
confronted Berry.  The two men fought, and Berry called out to
Jarrett Smith ("Smith"), his co-defendant at trial, to "pop
them."  Brown and Grant ran, shots were fired, and a bullet
struck Grant in the back, seriously injuring him.  At that point
Berry and Smith got into a car and sped away.  The police
pursued the car on the Harlem River Drive and then on the FDR
Drive.  Smith and Berry abandoned their car in traffic and fled
on foot.  Police officers caught Berry and Smith and took them

---

[1] For several years, including the period at issue here,
Brettschneider referred cases to Brenner for trial.
Brettschneider's firm was responsible for filing all pre-trial
motions, and Brenner was responsible for trying the case.  The
referrals principally included cases that involved forensic
issues, misidentification issues, or cases in which
Brettschneider was unable for whatever reason to try the case.

to the hospital where Grant was being treated.  Grant identified
both of them.  The next day, Brown identified Berry in a lineup.
Both victims identified Berry at trial.

Berry and Smith were indicted for these events in five
counts, the most serious being attempted murder in the second
degree.  That charge carried a maximum term of twenty-five
years' imprisonment.  The indictment joined the charges stemming
from the November 30 shooting with other charges against Berry
and Smith from an incident that had occurred just five days
earlier.

The evidence at trial showed that on November 25, 1999,
Berry and Smith approached two men in front of a shop at 154th
Street and Bradhurst Avenue in Manhattan.  While Smith aimed a
gun at them, Berry took their jewelry and cash, said "we
killers, we murderers," and tried to punch one of the victims in
the face.  When the victims ran away, shots were fired, and a
bullet hit one of them in the right shoulder.  At trial, both
victims identified Berry as one of the men who robbed them on
November 25, and they identified a hat that had been recovered
from Berry and Smith's November 30 getaway car as the hat Berry
wore during the robbery.  The indictment included 15 charges for
this November 25 incident, the most serious of which were two
more charges of attempted murder in the second degree.

It was Brenner's practice to describe to his clients the sentencing exposure on the top counts in an indictment and to explain whether a consecutive sentence could be imposed. Because of the passage of time, Brenner has no present recollection of having this specific conversation with Berry, but he knows of no reason why he would not have followed his regular practice. It appeared to Brenner that Berry understood that consecutive sentences could be imposed; after all, he was indicted for charges relating to two separate incidents.

Counsel for co-defendant Smith filed a motion on January 18, 2000 requesting inspection of the grand jury minutes and dismissal of the indictment, discovery, a bill of particulars, a Wade hearing, a Mapp hearing, and severance of the counts that relate to the two separate incidents.[2] On February 23, the New York County Supreme Court granted Smith's requests for inspection of the minutes, discovery, a bill of particulars, and the hearings; it denied Smith's severance motion. Berry's counsel filed no pretrial motions.[3]

---

[2] A Wade hearing is held to determine whether a witness's pretrial identification of the defendant has "been so improperly suggestive as to taint an in-court identification." Lynn v. Bliden, 443 F.3d 238, 248 (2d Cir. 2006) (citation omitted). A Mapp hearing is held to determine whether physical evidence is inadmissible because it was obtained illegally. See United States v. Hammad, 858 F.2d 834, 840 (2d Cir. 1988).

[3] Following the state court's February 23 ruling, Berry filed several pro se applications. They included a bail application,

As Brenner gained a better understanding of the prosecutor's case, principally through receipt of discovery material, Brenner developed an assessment of the case. He thought that Berry had a defensible case if the events of November 25 were tried alone, but that the defense of those charges became much more difficult because of spillover prejudice from a joint trial with the November 30 charges. As for the latter charges, Brenner intended to pursue a mere presence defense and recommended that Berry take the stand and blame the shooting on his co-defendant since the prosecutor could not show who had fired the gun.

In his conversations with Brenner, Berry continually maintained that he was innocent. He said that he was in Queens at the time of the November 25 incident in Manhattan, and that all he had done on November 30 was have a fight. He denied assaulting Brown on November 30, inflicting any serious injury on Grant, or being involved in any way in the shooting. He refused, moreover, to blame his codefendant for the shooting. Berry's decision deprived Brenner of his best strategy, but he respected Berry's decision.

In Brenner's view, he and Berry communicated well and understood each other's positions. Brenner had given Berry his

an omnibus motion, discovery requests, a motion for a hearing, and a speedy trial motion. Berry's motions cited case law and statutes relevant to his motions.

home telephone number.  In particular, they discussed the case
when they met in person at two or three court appearances during
the year preceding Berry's trial.[4]  Brenner reports that Berry
was engaged in their conversations about the case and that he
and Berry were candid with one another.  Berry, who was thirty
by the time of trial, was experienced with the criminal justice
system.  Brenner felt Berry had a good understanding of his
case.

At some point, Berry's indictment was assigned to the
Honorable John Bradley of the New York Supreme Court, New York
County.  Brenner told Berry at that time that Judge Bradley was
a fair trial judge but a "harsh" sentencing judge.  He described
the prosecutor as thorough but someone who could be distracted
by red herrings and get lost in the details.

Trial began on February 2, 2001.  Just before jury
selection, Berry was offered a plea of nine years' imprisonment
in satisfaction of all of the charges.  Brenner relayed the plea
offer to Berry and Berry's family and told Berry that it was a
generous offer in light of the charges and the evidence Berry
would face at trial.  Berry immediately and vehemently rejected

---

[4] There were many court appearances at which no counsel appeared
for Berry.  For some of those appearances, a notice of
engagement was filed on behalf of Brenner to explain his
absence.

the idea of entering any plea.[5]  Brenner never advises a client who adamantly maintains his innocence to plead guilty and did not advise Berry to take this plea offer.

As of the time Berry rejected the plea offer, Berry knew from his conversations with Brenner that the witness identifications for the first incident were vulnerable to attack, but that the joinder of the two incidents for trial made it more difficult to defend against the charges arising from the first incident.  He was of course aware that the shooting victim for the second incident had been seriously injured, that Berry and his co-defendant were charged with attempted murder, and that he had been caught by the police following a high-speed chase, having just left the scene of the shooting.  Berry had also rejected Brenner's recommendation that he place the blame for the shooting on his co-defendant.

After Berry rejected the plea offer, Judge Bradley engaged him in the following colloquy:

> The Court: [H]ave you had full opportunity to discuss with your lawyers the plea offers that have been made in this case? . . .
>
> Berry: Yes.
>
> The Court: I take it, you . . . want to go to trial, is that correct?

---

[5] Berry's family was in the courtroom at the time of the plea offer, and Berry may have had an opportunity to discuss his decision with them.

Berry: Yes. . . .

The Court: You understand that you could get a substantially longer sentence as a result of being convicted after trial, you understand that?

Berry: Yes.

The Court: You're willing to risk that, is that correct?

Berry: Yes.

Berry did not take the stand at trial.  He was convicted on all counts.[6]

Berry had new counsel following trial.  In advance of the sentencing hearing, Berry's new attorney asked for a psychological examination of Berry.  During that examination, Berry described to the physician his history and the charges against him.  Berry explained that he faced up to twenty-five years' imprisonment.

At sentencing, which occurred on June 11, 2001, the prosecutor reminded the court that the defendant had rejected a plea offer of nine years' imprisonment, and she summarized the trial evidence about the defendant's involvement in the separate incidents of November 25 and 30.  The prosecutor requested a sentence of forty-five years and explained that she was asking

---

[6] Counts eight and nine, which were for robbery in the first degree, were submitted in the alternative.  Since the jury returned guilty verdicts on counts six and seven, also for robbery in the first degree, it did not render a verdict on counts eight and nine.

for the court to impose consecutive sentences for the two incidents, as it had done when it sentenced Smith. Defense counsel mainly argued that Berry's greatest crime was associating with Smith, and asked for the minimum sentence on all counts arising from the two separate incidents and for all sentences to run concurrent with each other. Berry addressed the sentencing court briefly. He apologized for "hanging out with the wrong company," extended his sympathy "to those who I injured," thanked the court for a fair trial, and asked for mercy.

Before imposing sentence, Judge Bradley explained that he had given Smith a sentence of up to fifty years' imprisonment because he had a "much worse record" than Berry and "he was the one who had the gun." The judge then imposed Berry's sentence by saying:

> The sentences on counts 1, 2, 3, 4, 5, 6, 7, 10, 11, 12, 13, 14, 18, 19 and 20 [the longest of which he had recently said was twenty years] shall run concurrently with each other. The sentences on counts 16 and 17 [which he had recently said were fifteen years] shall run concurrently with each other, but consecutively to the sentences on the other counts.

The court instructed defense counsel to advise Berry of his right to appeal. Defense counsel so advised Berry and simultaneously presented a notice of appeal to the prosecutor.

Through his lawyer, Berry asked to address the court.  The court granted his request, and the following dialogue took place:

> Berry: She's saying that -- ADA Bonnie Sard saying I told Jerry Smith.  I didn't tell Jerry Smith to shoot anyone.  Just put that on the record.
>
> The Court: Very well.  The record speaks for itself. The Appellate Court will receive the transcript.
>
> Berry: Bonnie Sard, James Berry never bows down.

In the years following his conviction, Berry remained in contact with Brenner.  In none of their telephone conversations or correspondence did Berry ever assert that he wished he had taken a plea or express surprise that he had received a consecutive sentence.  Brenner also had several conversations with Berry's appellate counsel, and at no point did Brenner's ineffectiveness regarding the plea offer arise.

For the five years that followed his sentence, Berry actively challenged his conviction but never claimed that trial counsel should have advised him to plead guilty, that he would have pleaded guilty if so advised, or that he was unaware that he could be sentenced to as much time as Judge Bradley imposed in 2001.[7]  He did raise other issues, however, regarding his sentence.  For example, in his March 1, 2004 direct appeal,

---

[7] During this time, Berry also took other steps to undermine his conviction.  Berry made Freedom of Information Law requests to get the home addresses of the attorneys who had represented him and of the victims who testified at trial.  His aunt pleaded guilty to abusing her job at the New York Police Department to help Berry obtain personal information about one of the victims.

Berry argued, _inter_ _alia_, that the trial court had imposed an excessive sentence in retribution for Berry's choice to go to trial rather than take the plea offer.[8]  The Appellate Division, First Department denied this appeal; and the New York Court of Appeals denied leave to appeal.  Berry filed a _pro se_ coram nobis petition on June 12, 2006, making the sole argument that appellate counsel had been ineffective in not arguing that Berry's sentence was excessive in light of Berry's lack of an extensive criminal record.  This petition was also denied by the Appellate Division, First Department; and the Court of Appeals denied leave to appeal.

It was not until his September 11, 2006 _pro se_ petition for a writ of habeas corpus that Berry claimed that trial counsel provided ineffective assistance with respect to the plea offer.[9] He argued in the petition, along with five other claims, that Brenner failed to "provide Berry with advice as to whether to accept the prosecution's favorable 9 year plea offer."  This petition was referred to Magistrate Judge Katz by an order dated

---

[8] The Report describes the four additional arguments Berry made in this appeal, including his claim that Brenner rendered ineffective assistance for failing to file any pre-trial motions.  Berry filed a subsequent _pro se_ request for permission to file a supplemental brief on appeal and this request was granted, but Berry opted not to make any _pro se_ filings in support of his direct appeal.

[9] The petition is dated August 3, 2006, and was filed on September 11, 2006.

September 28, 2006.  Since Berry had not exhausted the claim about the plea offer, Judge Katz stayed the habeas action and allowed Berry to file a N.Y. Crim. Proc. L. section 440.10 motion ("440 motion").

In his pro se 440 motion, filed on February 5, 2007, Berry claimed that Brenner told him neither his "maximum sentencing exposure" nor that he may face a consecutive sentence for the November 25 and 30 crimes, never informed him of the strength of the prosecution's case, and never advised him whether to accept the nine year plea offer.[10]  He argues that "[g]iven that Berry would have to face two criminal cases in a single trial and lacked a potent defense to the charges, it was simply suicidal to insist on a trial."  Berry also asserts that after he declined the nine year plea offer, Brenner "instruct[ed] Berry to affirmatively answer any question the court asked him about the plea."  The motion asserts that Berry would have pleaded guilty if he had known "either the strength of the prosecution's case, his chances for acquittal, his maximum sentencing exposure, or been advised that it was in his best interest to take the prosecution's plea offer."  In his memorandum of law Berry relies on Strickland v. Washington, 466 U.S. 668 (1984), and relevant Second Circuit precedent.

---

[10] As the Report discusses, Berry also argued in this motion that the prosecution failed to disclose Brady/Giglio material related to one of its trial witnesses.

In a June 21, 2007 order, the Supreme Court denied Berry's 440 motion.  The court concluded that Berry's ineffective assistance of counsel claim was "factually and legally unsupported," and was "contradicted by defendant's statements" in the colloquy that took place between Berry and the trial judge prior to jury selection.  On October 23, 2007, the Appellate Division, First Department denied leave to appeal because there was no question of law or fact which ought to be reviewed.

On November 9, 2007, Judge Katz lifted the stay of this action.  Respondent filed a memorandum opposing Berry's petition on February 19, 2008.  Berry filed a traverse dated May 22, which reiterated the claims he had made in his 440 motion. Judge Katz appointed counsel for Berry on June 17, 2008 and held a hearing on November 3, where Berry and Brenner testified about the claim that Brenner provided ineffective assistance regarding the plea offer.

In his Report, Judge Katz rejected each of Berry's habeas claims but one.  He found that Brenner had provided ineffective assistance of counsel to Berry in three ways: Brenner did not remind Berry at the time of the plea offer of the strengths and weaknesses of the case against him, had never advised Berry of the maximum term of imprisonment that he faced if convicted at trial, and never advised Berry to accept the plea offer of nine

14

years.  The State filed a timely objection to the Report's
conclusion that Brenner provided ineffective assistance
regarding the plea offer.  Berry's counsel filed a letter brief
in support of the Report and did not object to Judge Katz's
recommendation that the remainder of the petition be denied.

Berry and Brenner testified for a second time on the claim
that Brenner provided ineffective assistance regarding the plea
offer, this time at a hearing before this Court on April 30,
2009.  Berry denied that Brenner ever discussed the strength of
the State's case against him, although he admitted being told
that the first incident was based on weak identification
testimony.  Berry explained that he had expected that if he were
convicted he would get eighteen years.  He asserted that he did
not know at that time what his maximum exposure was, but
expected that Brenner would be able to win a second acquittal
for him.

Berry explained that he refused to take a sentence of nine
years, since all he had done was have a fight.  On the other
hand, he asserted that he would have pleaded guilty if Brenner
had advised him to plead guilty, had informed him of his
sentencing exposure, and had told him that he would be convicted
at trial.

Berry admitted that he had repeatedly told Brenner that he
was innocent.  Berry reiterated during the hearing that he had

played no role whatsoever in the events of November 25 since he was in Queens that day; he denied being lewd, stealing money or jewelry, or hitting anyone.  As for the November 30 incident, he asserted that a woman had rubbed against him, that he had had a fight with her boyfriend, that some unidentified person fired a shot, and that he jumped in a car to leave the scene.  He denied telling anyone to shoot or playing any role in the shooting or in any attempt to seriously injure Grant.  Berry testified that he would not have told Judge Bradley that he had played a role in these incidents:

> ADA Felig: If Judge Bradley had said to you while you were under oath, did you, James Berry, with intent to cause the death of Reginald Dent, attempt to cause the death of Reginald Dent, would you have answered yes or no?
>
> Berry: No.
>
> ADA Felig: And if Judge Bradley had said to you, as you were under oath, please describe the manner in which you, James Berry, attempted to cause the death of Reginald Dent, how would you have answered?
>
> Berry: I don't think I could have answered that, because I didn't attempt to cause the death of Reginald Dent.
>
> . . . .
>
> ADA Felig: And similarly, if Judge Bradley had asked you, Mr. Berry as you were under oath, did you, with intent to cause the death of Shyrone Willis on November 25, 1999 . . . would you have answered yes or no?
>
> Berry: No.

. . . .

ADA Felig: And if Judge Bradley had said, what role
did you play in the County of New York on or about
November 25, 1999, in attempting to cause the death
of Shyrone Willis, what would you have said?

Berry: I didn't play a role in that either.

ADA Felig: Thank you.  And if Judge Bradley had
similarly said to you, what role did you play in the
County of New York on or about November 30, 1999, in
attempting to cause the death of Boris Grant, with
intent to cause his death, what would you have said?

Berry: I would have said I had a fight with him.

ADA Felig: Would you have said that you intended to
cause his death?

Berry: No.

ADA Felig: Would you have said you assisted another
in any manner in attempting to cause his death?

Berry: No.

According to Berry, Brenner told him to just say yes when the

judge inquired whether he had been advised of the plea offer.

Berry repeatedly gave false testimony during the hearing.

For example, until his attorney revisited the subject on

redirect examination, Berry denied that his aunt was involved in

an effort to get the personal information for trial witnesses.

He also denied knowing what the maximum sentence was on any

count, but then admitted that he had told the physician who

interviewed him before his sentencing that he anticipated a

prison sentence of up to twenty-five years.

Based on an examination of this entire record, including the November 3 hearing before Judge Katz, and this Court's assessment of the credibility of Brenner and Berry during their testimony in April 2009, this Court finds the following with respect to Berry's claims concerning Brenner's failure to advise him adequately in connection with the plea offer. Brenner did not explicitly advise Berry on February 2, 2001 to plead guilty and accept the offer of a nine year sentence. Brenner did, however, advise Berry that it was a generous offer.

At the time that Berry rejected the offer, he understood the maximum sentencing exposure that he faced, that is, a fifty year sentence if the sentencing judge imposed the maximum sentence of twenty-five years for the attempted murder counts on each incident to run consecutively. While Brenner could not remember in 2008 and 2009 the conversation in which he had informed Berry in 2000 of his sentencing exposure, there is no reason that Brenner would not have followed his customary practice in 2000 in this regard and advised Berry of the sentencing range for each top count. And there is compelling circumstantial evidence to confirm that this conversation did occur and that Berry was fully aware of his sentencing exposure. Berry was an active client who was fully engaged in his defense; it is difficult to imagine that he would not have asked about sentencing issues if his attorney had for some reason neglected

to advise him.  As significantly, at the sentencing proceeding,
Berry expressed no surprise at getting a sentence greater than
the twenty-five year maximum.  The prosecutor referred to
Smith's lengthy sentence, asked for a sentence of forty-five
years for Berry, and referred to the imposition of consecutive
sentences.  His own attorney at sentencing asked for concurrent
sentences.  The judge imposed a sentence of fifteen years to be
served consecutively to a twenty year sentence.  Berry asked to
speak after sentence was imposed and did not express surprise
that a sentence longer than what he understood to be the
statutory maximum had just been imposed.  His attorney, who had
not represented Berry at trial, never protested that Berry had
just informed him that he never understood that he could be
sentenced to more than twenty-five years' imprisonment.  Even if
one assumes, because Judge Bradley did not state the final
aggregate sentence, that Berry may not have immediately
understood that he had been sentenced to thirty-five years'
imprisonment, for five years after that hearing, during which
time there can be no doubt that Berry understood that a thirty-
five year sentence had been imposed, Berry actively challenged
his conviction, attacked his sentence, and complained about his
representation, but never claimed that trial counsel had failed
to inform him of his sentencing exposure.

At the time Berry rejected the nine year plea offer, he also understood the strength of the prosecution's case against him.  Brenner is completely credible when he describes his pre-trial discussions with Berry and Berry's family about the strength and weaknesses of the state's evidence against Berry.[11] Indeed, Berry has not denied that Brenner explained to him the difficulties posed by having the charges for the November 25 and 30 events joined for trial, which made it more difficult to challenge the identification testimony for the earlier incident. Berry himself admits discussing the issue of severance with Brenner and admits having been told that the November 25 identification testimony was vulnerable to attack.  Nor has Berry denied that Brenner advised him to take the stand and blame Smith for the November 30 shooting.

While Judge Katz correctly found that Brenner did not remind Berry of these issues when he conveyed the plea offer to Berry, there is absolutely no reason to find that any reminder was necessary or that the failure to remind Berry constituted unprofessional conduct.  Berry knew full well that the victim of

---

[11] Petitioner's counsel cross-examined Brenner about his disciplinary record before the bar.  As described in this Opinion, Berry's own admissions and strong circumstantial evidence support Brenner's testimony.  In addition, in contrast to Berry, Brenner gave forthright and credible testimony during the hearing.  Therefore, the disciplinary record, while important to consider, does not undermine Brenner's testimony on the issues at stake here.

the November 30 shooting had been seriously injured and that he
and Smith had been arrested fleeing from the scene of that
shooting, and that one of the victims of the November 25
incident had been shot.  These were serious charges and the
evidence connecting Berry to the scene of the November 30
shooting was particularly strong.  He also knew that the victims
had identified him.  The strength of the state's case was not
difficult to fathom; this was not a case built on circumstantial
evidence.

Nor has Berry pointed to any specific factors that would
have interfered with him remembering or understanding his prior
conversations with Brenner about the evidence he faced.  He does
not assert that age, mental status, inexperience with the
criminal justice system, hesitation upon hearing the plea offer,
or any other factor should have suggested to counsel that it was
necessary to review the strength of the case again to make sure
that Berry was adequately considering this opportunity.  Berry
was 30 years old, he was an experienced criminal defendant, he
had no difficulty understanding what Brenner said to him or in
expressing his own views, and he quickly and adamantly refused
to consider the option of pleading guilty.  In sum, there is no
basis to find that Brenner failed his duties to his client on
February 2, 2001 by not reminding Berry of the strength of the
evidence against him.

Finally, Berry has not shown that he would have pleaded guilty had Brenner advised him to accept the plea offer.  As Berry advised the trial judge, he understood that he could get a "substantially longer" sentence as a result of being convicted at trial and was "willing" to take that risk.  Berry's self-serving testimony that Brenner told him to just say yes to anything the trial judge asked is rejected as false.

Moreover, although Berry now asserts that he would have pleaded guilty if Brenner had recommended that course of action to him, he does not deny that he always told Brenner that he was innocent of the charges against him, and he still contends that he is innocent.  Berry continues to claim that he was in Queens at the time of the November 25 shooting in Manhattan, and that he had no involvement whatsoever with the November 30 shooting. As he explained at the recent hearing, he would not have told the state court judge that he played any role in the attempted murders with which he was charged.

DISCUSSION

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  The court must make a de novo determination of the portions of the report to which objections are made.  28 U.S.C. § 636(b)(1); see United

States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997).  To

accept those portions of the report to which no timely objection

has been made, "a district court need only satisfy itself that

there is no clear error on the face of the record."  Figueroa v.

Riverbay Corp., No. 06 Civ. 5364(PAC), 2006 WL 3804581, at *1

(S.D.N.Y. Dec. 22, 2006) (citation omitted).

The Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, modified the

standard under which federal courts review § 2254 petitions.

Where the state court has reached the merits of the federal

claim, habeas relief may not be granted unless the state court's

decision was "contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined

by the Supreme Court of the United States" or "was based on an

unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  28 U.S.C.

§§ 2254(d)(1), (d)(2).  State court factual findings "shall be

presumed to be correct" and the petitioner "shall have the

burden of rebutting the presumption of correctness by clear and

convincing evidence."  Id. at § 2254(e)(1).

A state court decision involves an "unreasonable

application" of Supreme Court precedent if the state court

"identifies the correct governing legal principle from [the

Supreme] Court's decisions but unreasonably applies that

23

principle to the facts of the prisoner's case."  Williams v.
Taylor, 529 U.S. 362, 413 (2000) (opinion of the Court, by
Justice O'Connor in Part II).  "[I]t is well-established in this
Circuit that the 'objectively unreasonable' standard of §
2254(d)(1) means that a petitioner must identify some increment
of incorrectness beyond error in order to obtain habeas relief."
Rosa v. McCray, 396 F.3d 210, 219 (2d Cir. 2005) (citation
omitted).  "[C]learly established Federal law in § 2254(d) refers
to the holdings, as opposed to the dicta, of [the Supreme]
Court's decisions as of the time of the relevant state-court
decision."  Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing
Williams, 529 U.S. at 412); accord Gibbons v. Savage, 555 F.3d
112, 116 (2d Cir. 2009).

I. Ineffective Assistance of Trial Counsel: Rejection of Plea
Offer

    Berry claims that trial counsel provided ineffective
assistance in failing to advise Berry to accept the plea offer.
To prevail on an ineffective assistance of counsel claim, a
defendant must show (1) that his attorney's performance fell
below an objective standard of reasonableness, and (2) that as a
result he suffered prejudice.  Strickland v. Washington, 466
U.S. at 687-88.  The performance inquiry examines the
reasonableness of counsel's actions under "all the
circumstances," id. at 688, and from the perspective of counsel

at the time, id. at 689; Rompilla v. Beard, 545 U.S. 374, 381 (2005).  A court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  As to prejudice, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

The Court has scarcely discussed Strickland in the context of advising clients on plea offers.[12]  In Hill v. Lockhart, 474 U.S. 52 (1985), the petitioner sought habeas relief on the ground that his attorney failed to advise him that as a second offender he would be required to serve half of his sentence before becoming eligible for parole.  Id. at 53.  The Court held that the Strickland test "applies to challenges to guilty pleas based on ineffective assistance of counsel," id. at 58, and concluded that the petitioner's allegations did not satisfy

---

[12] In von Moltke v. Gillies, 332 U.S. 708 (1948), a pre-Strickland case, the Court noted the general need for effective assistance of counsel in the plea context.  The habeas petitioner in that case had been indicted, appeared before the district court without a lawyer, waived her right to be represented by counsel, and pleaded guilty.  When that petitioner challenged her conviction and sentence, the Court remanded the case to the district court, and held that "[p]rior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered."  Von Moltke, 332 U.S. at 721.

Strickland's prejudice prong.  In the context of a plea of guilty, the prejudice requirement is satisfied if the petitioner shows "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59.  The Court held that no prejudice had been shown since the consideration of parole eligibility was the same whether the petitioner was convicted at trial or pleaded guilty.  Id. at 60.

In Florida v. Nixon, 543 U.S. 175 (2004), defense counsel conceded guilt at the guilt phase of a capital trial after discussing the strategy with the defendant, but without obtaining his express consent.  Id. at 178-79.  Given the defendant's "constant resistance" to responding to questions, his attorney's decision to concede guilt without his client's express permission did not violate Strickland where defense counsel had fulfilled his duty of consulting with his client to explain the proposed strategy and its potential benefits, and that strategy was reasonable "given the evidence bearing on the defendant's guilt." Id. at 189, 192.

In Wright v. van Patten, 128 S. Ct. 743 (2008) (per curiam), the petitioner sought habeas relief on the ground that his attorney was not physically present for his plea hearing; his attorney appeared via speaker phone. Id. at 744.  The Court applied AEDPA deference, reversed the Seventh Circuit, and found

that Supreme Court "precedents do not clearly hold that counsel's participation by speaker phone" necessarily constituted ineffective assistance of counsel. <u>Id.</u> at 746.

Beyond these statements, the Court has been silent on what counsel must do to fulfill their duty to provide effective assistance of counsel in the context of a plea offer.  When a petitioner's <u>Strickland</u> argument is made in the context of a § 2254 petition, moreover, the petitioner must "do more than show that he would have satisfied <u>Strickland's</u> test if his claim were being analyzed in the first instance[;]" he must show that the state court "applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner." <u>Bell v. Cone</u>, 535 U.S. 685, 698-99 (2002).  This is a "substantially higher threshold." <u>Knowles v. Mirzayance</u>, No. 07-1315, slip op. at 11 (U.S. Mar. 24, 2009).  "[B]ecause the <u>Strickland</u> standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." <u>Id.</u>  Thus, when Supreme Court precedent neither "squarely addresse[d]" the issue in the case nor gave a "clear answer to the question presented," the Court has given a wide berth to the state court's conclusion that the petitioner has failed to satisfy <u>Strickland</u>.  <u>Wright</u>, 128 S.Ct. at 746-47 (citation omitted).  For example, after noting that none of its precedents had addressed "a situation in which a client interferes with

27

counsel's efforts to present mitigation evidence to a sentencing court," the Court found that it was not objectively unreasonable for the state court to conclude that when such interference exists the defendant cannot establish Strickland prejudice "based on his counsel's failure to investigate further possible mitigating evidence." Schriro v. Landrigan, 550 U.S. 465, 478 (2007).

For its part, the Second Circuit has described AEDPA deference in the context of a Strickland claim as follows:

> Prior to AEDPA, it sufficed for a grant of habeas for a federal court to conclude that the petitioner was denied adequate representation and suffered prejudice, within the meaning of Strickland. AEDPA, however, requires more than a conclusion that counsel's performance was constitutionally inadequate. Under the AEDPA standard, objectively unreasonable application involves some increment of incorrectness beyond error. Habeas may not be granted unless the federal court concludes not only that counsel's performance was deficient, but also that the state court's conclusion to the contrary was unreasonable. Satisfaction of the 'unreasonable application' requirement does not follow inevitably from the district court's conclusion that [petitioner's counsel's] performance was deficient.

Carrion, 549 F.3d at 591 n.4 (citation omitted).[13]  In Carrion,
the Court of Appeals reminded the district court of the need to
distinguish between applying federal standards for ineffective
assistance of counsel, in that case a failure to advise a client
to accept a plea bargain, see Boria v. Keane, 99 F.3d 492, 498
(2d Cir. 1996), and analyzing the reasonableness of the state
court determination that counsel's representation was adequate.
Carrion, 549 F.3d at 591 n.4.

     Consistent with its admonition in Carrion, in Hemstreet v.
Greiner, 491 F.3d 84 (2d Cir. 2007), the Court of Appeals
explained that, "[e]ven if we were to conclude that the
Appellate Division had erred . . . and that [petitioner] had
presented a colorable claim under Strickland, AEDPA would
nevertheless require us to defer to the state court's
determination unless it was objectively unreasonable."  Id. at
90 n.2.  Anticipating the Court's discussion in Knowles, slip

---

[13] The commentary in Carrion on the application of the AEDPA
standard to Strickland claims is consistent with Wright, 128 S.
Ct. at 746, but may be in tension with Aparicio v. Artuz, 269
F.3d 78, 95 n.8 (2d Cir. 2001) ("It is beyond cavil that the
Strickland standard qualifies as 'clearly established Federal
law.'  For AEDPA purposes, a petitioner is not required to
further demonstrate that his particular theory of ineffective
assistance of counsel is also 'clearly established.'") (citation
omitted); see also Davis v. Greiner, 428 F.3d 81, 87 n.5 (2d
Cir. 2005) ("The government suggests that, because the Supreme
Court has never considered Strickland in the context of facts
similar to this case, there is no clearly established law to
apply in this case.  This argument is foreclosed by our decision
in Aparicio v. Artuz." (citation omitted)).

op. at 11, the Court of Appeals has observed that "where the governing rule remains . . . roughly defined, we are less likely to conclude that a given interpretation or application of Supreme Court law is 'contrary to' or an objectively 'unreasonable application of' Supreme Court precedent for purposes of § 2254(d)(1)."  Serrano v. Fischer, 412 F.3d 292, 300 (2d Cir. 2005).

The state court examining Berry's 440 motion in 2007 determined that Brenner had not denied Berry effective assistance of counsel.  It concluded that the claim was unsupported and also relied on Berry's colloquy with the trial court indicating that he had discussed the plea with Brenner, understood that he could get "a substantially longer sentence" if convicted at trial, and was willing to take that risk and go to trial.  The state court was entitled to evaluate Berry's claim by relying on the strength of his showing and his responses to the trial court as he rejected the plea offer.  See Schriro, 550 U.S. at 477, 479-80 (state court properly relied on defendant's sentencing colloquy to find that defendant could not demonstrate Strickland prejudice).[14]  Its conclusion that Berry

---

[14] In the context of a plea of guilty, the Supreme Court has held that statements at a plea hearing "carry a strong presumption of verity."  Blackledge v. Allison, 431 U.S. 63, 74 (1977); accord United States v. Doe, 537 F.3d 204, 213 (2d Cir. 2008) ("statements at a plea allocution carry a strong presumption of veracity").  The Second Circuit has said that statements made at

received effective assistance of counsel does not constitute an objectively unreasonable application of the first prong of Strickland.  As such, habeas relief is not authorized under § 2254(d)(1).

The existence of this colloquy between the trial judge and Berry at the moment that Berry rejects the plea offer is particularly significant.  It is entirely fair to assume that the experienced and able state court judge would have conducted an even more searching inquiry if he had any doubt, based on Berry's age, mental ability or sophistication, the quality of defense counsel, or any other relevant factor, that Berry understood the significance of his decision to reject the plea offer.  The judge's direct interaction with Berry about this decision is entitled to great weight in any assessment of whether Berry made a voluntary and informed decision to reject the plea offer.

Even if it were appropriate to consider the Second Circuit's Strickland jurisprudence, the state court determination cannot be said to be an unreasonable application of Strickland.  The Second Circuit requires a fact intensive

---

an allocution "carr[y] such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made."  United States v. Juncal, 245 F.3d 166, 171 (2d Cir. 2001) (citing Blackledge, 431 U.S. at 74).

inquiry to determine the reasonableness of counsel's actions. Counsel "should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Purdy v. United States, 208 F.3d 41, 45 (2d Cir. 2000).  In particular, the terms of any plea offer must be communicated to the defendant.  Id.  Counsel need not advise the defendant "in so many words" to plead guilty or not where counsel's other communications with the defendant reasonably advise him of the relevant considerations.  Id. at 46.  This is true especially where a defendant protests that he is innocent and defense counsel must exercise good judgment in steering "a course between the Scylla of inadequate advice and the Charybdis of coercing a plea."  Id. at 45.  The Court of Appeals is particularly "wary of endorsing any precedent that . . . might suggest a duty on the part of defense counsel to arm-twist a client who maintains his innocence into pleading guilty." United States v. Pitcher, 559 F.3d 120, 125 (2d Cir. 2009).  The reasonableness of counsel's actions will be judged by examining among other things the disparity in probable sentences and the likelihood of conviction at trial.  Carrion, 549 F.3d at 590.

Judged against these standards, Berry's claim of ineffective assistance must fail.  Given Berry's adamant denial of guilt in his conversations with Brenner, and given that Berry

had been informed of and understood the risk of conviction and his sentencing exposure, Brenner was not required to advise Berry as well that he should plead guilty when he conveyed the plea offer of a nine year term of imprisonment to him.  Brenner pointed out that the offer was "generous" in the circumstances, and Berry has not shown that Brenner should have had any doubt that Berry fully understood the implications of that assessment. As Berry told the trial judge, he was willing to take the risk of a substantially longer sentence.

Berry has also failed to establish prejudice from Brenner's failure to advise him to plead guilty.  He has not shown that he would actually have entered a plea if Brenner had made an explicit recommendation that he plead guilty.

II.  Other Claims

In his habeas petition, Berry raised a number of other claims, which Magistrate Judge Katz thoroughly discussed in the Report.  The Report rejects each of these claims as either unexhausted or meritless.  Berry did not object to these conclusions.  Since the Court can discern no clear error in the Report's reasoning with regard to these claims, these remaining claims are rejected.

CONCLUSION

The recommendation of Magistrate Judge Katz is rejected and the petition for a writ of habeas corpus is denied. This Court issues a certificate of appealability ("COA") on the petitioner's claim of ineffective assistance regarding the plea offer. Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that . . . includes showing that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner."); accord Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005). The Clerk of Court shall dismiss this petition and close the case.

SO ORDERED:

Dated:    New York, New York
          May 12, 2009

                                        DENISE COTE
                              United States District Judge